# Exhibit A

PET TECHNOLOGIES, INC. D/B/A INMOTION GROUP CONFIDENTIAL

SOURCE CODE AND OBJECT CODE LICENSE

This Source Code and Object Code License ("Agreement") is made and entered into by and between Pet Technologies, Inc., a Michigan corporation d/b/a inMotion Group with a place of business at 116 Kenyon, Troy, MI 48083 ("Developer"), and Jema Media, LLC, an Arizona limited liability company with a place of business at 15230 N 75th Street #2080, Scottsdale, AZ 85260 ("Company"). The effective date of this Agreement shall be January 18, 2011 ("Effective Date").

RECITALS

A.     Developer owns or has rights to license certain server software used to operate and manage a full feature, pay-per-click online advertising network, which software is more fully described on Exhibit A.

B.     Company desires to license both the Source Code (as defined below) and Object Code (as defined below) forms of such server software to enable Company to run its own pay-per-click advertising network.

C.     Developer is willing to license such software as more fully set forth and described below.

AGREEMENT

NOW, THEREFORE, the parties agree as follows:

1. **Definitions.**

   1.1     **"Company Offering"** means any Company product or service, whether offered by Company under its brand or marks or otherwise.

   1.2     **"Confidential Information"** means that information and know-how of either party ("Disclosing Party") which is disclosed to the other party ("Receiving Party") pursuant to this Agreement, in written form and marked "Confidential," "Proprietary" or similar designation, or if disclosed orally, the Disclosing Party shall indicate that such information is confidential at the time of disclosure and send a written summary of such information to the Receiving Party within thirty (30) days of disclosure and mark such summary "Confidential," "Proprietary" or similar designation.

   1.3     **"Deliverable"** means each item to be provided to Company hereunder, including, without limitation, the Software, Updates, Source Code Materials and Installation Guides.

   1.4     **"Derivative Works"** means any discrete modification to a Deliverable made by or for Company, and any modified, altered, enhanced or adapted version of the Deliverable or derivative work (as such term is defined under United States copyright law) based on the Deliverable.

   1.5     **"Easter Egg"** means a reproducible, undocumented, hidden and non-obvious software component or routine that (a) is not a legitimate software feature, (b) is intentionally placed in a software program or application by the developer for personal reasons, (c) has personal meaning or significance to the developer, (d) is not malicious, and (e) is intended to be entertaining or fun.

   1.6     **"Installation Guides"** means the installation instructions for the Software.

   1.7     **"Intellectual Property Rights"** mean copyright rights (including, without limitation, the exclusive right to use, reproduce, modify, distribute, publicly display and publicly perform the copyrighted work), trademark rights (including, without limitation, trade names, trademarks, service marks, and trade dress), patent rights (including, without limitation, the exclusive right to make, use and sell), trade secrets, moral rights, right of publicity, goodwill and all other intellectual property rights as may exist now and/or hereafter come into existence and all renewals and extensions thereof, regardless of whether such rights arise under the law of the United States or any other state, country or jurisdiction.

   1.8     **"NR Fees"** means the non-recurring fees set forth on Exhibit B.

   1.9     **"Object Code"** means software in machine-readable form that is directly executable, which software typically is created by assembling or compiling Source Code with the Zend Guard Suite Version 3.6.0 or greater.

Initials: [signature] [signature]

PET TECHNOLOGIES, INC. D/B/A INMOTION GROUP CONFIDENTIAL

1.10   "Open Source Software" means any software or software component that is available without royalty or fee to the public that (a) lawfully requires as a condition of distribution of such software or any derivative thereof or modification thereto, that such software, derivative or modification (i) include or make available without charge its Source Code; (ii) be licensed for the purpose of free use and making derivative works and modifications to such software or software component; and (iii) cannot be redistributed under terms inconsistent with those applicable to the rights under which the developer was entitled to use or modify the original software; or (b) by virtue of containing, being derived in any manner (in whole or in part) from, or statically or dynamically linking to or against any software described in clause (a) of this definition, becomes software that falls under clause (a) of this definition. By means of example and without limitation, any software or software components, modules or packages licensed or distributed under any of the following licenses constitute Open Source Software: GNU's General Public License (GPL) or Lesser GPL (LGPL), the Artistic License, the Mozilla Public License, the Common Public License, the Sun Community Source License (SCSL), and the Sun Industry Standards Source License (SISSL).

1.11   "Schedule" means the time schedule set forth on Exhibit C for the performance of Developer's obligations under this Agreement with respect to the delivery of the Software (Object Code and Source Code) and related Source Code Materials.

1.12   "Software Errors" means any reproducible and repeatable defect or combination of defects in a Deliverable that: (a) prevent it from conforming to, or performing in accordance with, its applicable Specifications, or (b) result from deviations from commonly accepted standards for normal and correct operation of computer programs, even if not explicitly mentioned in the applicable Specifications, or (c) allow the user to use the Deliverable, but only with major restrictions on its functionality, or (d) cause the Deliverable to: (i) abnormally cease to function, or (ii) produce incorrect or misleading information or erroneously interpret information given to it, or any similar deviation, or (e) cause it to fail to comply with any written acceptance criteria in the applicable Specifications or other criteria agreed upon in writing by the parties. Software Errors shall also include any misspelled or incorrect text in any Deliverable.

1.13   "Source Code" means software in human-readable form, which software typically is read and written by programmers (including without limitation the necessary build scripts, make files, bitmaps and images) and converted by assembly or compilation into Object Code prior to execution by a computer.

1.14   "Source Code Materials" means all software, documentation and materials, other than the Software, that are necessary and/or useful to enable a reasonably skilled computer programmer or analyst to use, maintain and enhance the Software without the aid of Developer or any other person or reference to any other materials produced by Developer, including, without limitation, all technical or engineering level documentation; Developer-owned maintenance tools and test programs; a description of the applicable software settings and specifications, and complier and assembler settings and descriptions, and a list of third party tools, utilities and software programs used by Developer to build, support and/or maintain the Software.

1.15   "SOW" means the statement of work set forth on Exhibit E.

1.16   "Specifications" means with respect to the Software, the functional and technical specifications and requirements for such software, as set forth on Exhibit A.

1.17   "Software" means the unmodified version of Developer's ad serving software known commercially as "inClick," as further described on Exhibit A.

1.18   "Updates" means all new versions, maintenance releases, error corrections and upgrades to a software release, including, but not limited to, subsequent releases containing new features or functionality.

2.   Developer Obligations.

2.1   Initial Delivery. In exchange for the payment of $115,000 by Company, which has been made prior to execution of this Agreement, Developer

Initials: ___

PET TECHNOLOGIES, INC. D/B/A INMOTION GROUP CONFIDENTIAL

has delivered the Software in Source Code form and related Source Code Materials. All Deliverables are subject to Company's acceptance, as further specified herein.

2.2 **Development and Modifications.** Company has not retained Developer to modify the Software to develop any customized versions of the Software hereunder but may retain any third party of Company's choosing to do so, or Company may do so directly.

2.3 **Technical Contacts.** Company and Developer shall each designate a technical contact (each, a "Technical Contact") as the primary individual(s) responsible for facilitating communication between Company and Developer. The initial Technical Contact for each party is set forth on Exhibit F. Each party may change its Technical Contact upon written notice.

2.4 **Developer Expenses.** Developer shall be responsible for the cost of performing its obligations under this Agreement. Without limiting the foregoing, Developer shall obtain and pay for any and all software, hardware, intellectual property, equipment, technology, personnel, materials, and facilities that Developer needs to perform its obligations hereunder. Developer shall be responsible for furnishing all of the foregoing, except as otherwise expressly agreed to in writing by Company. Developer is responsible for obtaining any third party software development tools, including, without limitation, third party build tools or IDEs, needed to develop the Deliverables. Developer will not be supplying these third party tools to Company.

2.5 **Acceptance.** Upon delivery of each Deliverable to Company as required under the Schedule, Company shall have a period of fourteen (14) days to test and evaluate that Deliverable in Object form in order to attempt to discover the existence of Software Errors. If Company finds a Deliverable contains Software Errors, Company shall notify Developer. If Company does not so notify Developer within fourteen (14) days following receipt of a particular Deliverable, that Deliverable shall be deemed accepted. Developer shall have fourteen (14) days from receipt of each report to correct the identified Software Errors or, for Software Errors that Company agrees cannot be reasonably corrected within fourteen (14) days, such longer period of time as may be agreed in writing by the parties. For each Deliverable, the foregoing procedure shall be repeated until Company finally accepts (including deemed acceptance) or rejects it.

2.6 **Electronic Delivery Required.** All deliveries shall be made electronically unless another form of delivery is specifically agreed to in writing by Company. Simultaneous with the delivery of the Software, Developer shall provide Company with all related Source Code Materials and Installation Guides.

3. Licenses.

3.1 **Company Licenses.** Developer hereby grants to Company, under all of Developer's Intellectual Property Rights, a worldwide, perpetual, irrevocable, non-exclusive, royalty-free, license, to: (a) use, reproduce, modify and create Derivative Works of the Source Code form of the Software and assemble or compile such modified and unmodified Source Code into Object Code, (b) use, reproduce, modify and create Derivative Works of the Source Code Materials and other Deliverables in conjunction with Company's exercise of its rights and licenses hereunder, and (c) use the Software and Derivative Works, in Object Code form, on a stand-alone basis to operate an advertising network. Company may modify the Software at the source level, in any way as needed to serve its own requirements, either directly or by utilizing any third party developers of Company's choosing.

3.2 Updates.

3.2.1 If, during the initial one (1) year period following the Effective Date, Developer creates an Update to the Software, then Developer shall provide to Company such Update to Company free of charge within thirty (30) days following completion. After the expiration of such 1-year period, Company shall have, for an annual fee of twenty-three thousand dollars ($23,000), the right to elect to receive quarterly Updates to the Software that contain features and functionality required by Company.

3.2.2 If an Update contains features that depend on third party software to operate properly, Developer shall provide Company, at the time of

Initials: [signatures]

PET TECHNOLOGIES, INC. D/B/A INMOTION GROUP CONFIDENTIAL

delivery, with written notice of such fact and identify in its notice the third party software, by vendor and program and version. Developer shall not be responsible for providing Company with a copy of any such third party software.

    3.2.3    Once delivered, Updates to the Software shall be deemed Software for purposes of this Agreement.

4. Payments and Taxes.

    4.1    Fees. All payments under this Agreement shall be made in accordance with this Section 4 and with the terms set forth on Exhibit B. The fees described herein are expressed in U.S. dollars (unless otherwise specified) and do not include any taxes, duties or similar fees that may be collectable or withheld pursuant to law. All payments shall be made by check, via wire transfer into an account designated by Developer, or other similar instrument, and received by due date. Any default in payment shall result in a complete acceleration of the remaining amount due for such service or product.

    4.2    Previous Payment. Developer has invoiced Company, and Company has previously paid Developer, for the NR Fees as set forth on Exhibit B, for the initial two deployments. No further payments shall be due from Company under this Agreement unless Company elects additional deployments for the NR Fee as set forth on Exhibit B, or orders Updates under Section 3.2.1, or requires support services under Section 6.

    4.3    Taxes. Company shall pay all import duties, customs fees, sales (unless an exemption certificate is furnished by Company to Developer), use and value added taxes (except for taxes imposed on Developer's net income) with respect to any Deliverables developed and licensed hereunder and the services rendered for Company under this Agreement or furnish Developer with evidence acceptable to the taxing authority to sustain an exemption from such taxes. Developer shall bear or reimburse Company for all sales tax if any such taxes are required to be paid by Company by reason of Developer's failure to provide the Deliverables via electronic delivery (unless another form of delivery is specifically agreed to in writing by Company).

5. Sublicensing. Company agrees to not sublicense or redistribute Software, except, and solely to the extent, as needed to permit third party development of Derivative Works or customized versions of the Software for Company.

6. Support. Initial training shall be provided free of charge as set forth in Exhibit D. Developer agrees to provide technical support for the Deliverables as provided in the SOW, as it may be amended from time to time by mutual agreement of the parties.

7. Ownership. Developer shall remain the sole and exclusive owner of all right, title and interest, including all Intellectual Property Rights, in and to the Software, Source Code Materials and Installation Guides, with Company as a licensee of such rights.

8. Warranties.

    8.1    Software Performance. Developer represents and warrants that the Deliverables shall conform to, and function in accordance with, their applicable Specifications. If Company provides written notice to Developer of any failure of any of the Deliverables to satisfy the warranty set forth in this Section 8.1, Developer shall, within fourteen (14) days of its receipt of such notice, correct such failure and re-deliver the corrected versions of all affected items and related materials as described herein.

    8.2    Services. Developer represents and warrants that Developer shall: (i) perform all services provided to Company hereunder in a professional and workmanlike manner; and (ii) dedicate sufficient resources to fulfill all services provided to Company hereunder in an adequate and timely manner.

    8.3    Software. Developer represents and warrants that (i) the Deliverables are, and shall be, original with Developer, (ii) the Deliverables do not, and shall not, infringe upon or misappropriate any Intellectual Property Rights of others, (iii) Developer is the sole and exclusive owner of the Deliverables and has sufficient rights to grant the licenses herein granted to Company, (iv) Developer has not previously or otherwise granted any other rights in the Deliverables to any third party which conflict with the rights herein granted to Company, (v) the Deliverables do not and shall not contain any undocumented Open Source Software, and (vi) the

Initials: _____

PET TECHNOLOGIES, INC. D/B/A INMOTION GROUP CONFIDENTIAL

Source Code form of the Software, as provided by Developer at time of delivery, when compiled, will build into the Object Code form of the Software.

**8.4    Power and Authority.** Developer represents and warrants that it has all right, power and authority to enter into this Agreement and to grant the licenses hereunder.

**8.5    Export; Commodity Certification.** Developer represents and warrants that (a) except as expressly set forth on Exhibit A, the Deliverables do not contain any encryption technology and (b) they may be exported from the United States. Developer shall provide Company with a copy of the Commodity Classification for the Deliverables or, if this is not available, Developer shall provide Company with the ECCN that was used by Developer for self-certification. In addition, Developer shall advise Company as to General License type pursuant to which the Deliverables may be exported.

**8.6    No Trojan Horse.** Developer represents and warrants that no portion of the Deliverables shall contain, at the time of delivery, any virus, "back door," "time bomb," "Trojan horse," "worm," "drop dead device," or any other computer software routines or hardware components designed to (i) permit unauthorized access to, or use of, the Deliverables or computer systems on which the Deliverables is loaded, (ii) disable, damage or erase the Deliverables or data, or (iii) perform any other similar actions that would preclude full use of the Deliverables by Company. If any of the foregoing is discovered, Developer shall, in addition to any other rights that Company may have under this Agreement or at law or in equity, correct the problem or provide a patch, work around or any other method to eradicate the problem within five (5) days following notice by Company, at no cost to Company.

**8.7    No Easter Eggs.** Developer represents and warrants that no portion of the Deliverables shall contain, at the time of delivery, any Easter Egg.

**8.8    Warranty Disclaimer.** DEVELOPER MAKES NO ADDITIONAL WARRANTIES BEYOND THE WARRANTIES MADE HEREIN AND DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

**9.    Indemnification.** Developer shall, at its expense, indemnify, hold harmless and defend Company and its affiliates, and its and their officers, employees, agents, direct or indirect customers from and against any claims, suits, losses, liabilities, damages, court judgments or awards and the associated costs and expenses (including attorneys' fees), incurred because of actual or alleged infringement by any Deliverables or other material provided hereunder of any Intellectual Property Rights of a third party, provided that Developer is promptly notified and rendered reasonable assistance by Company (at Developer's expense). Should the use of the Deliverables by Company or its customers be enjoined, or in the event Developer reasonably believes such use may be enjoined, Developer shall, at its option, take one or more of the following actions: (i) substitute a fully equivalent non-infringing unit of the Deliverables; (ii) modify each infringing Deliverable so that it no longer infringes but remains functionally equivalent; or (iii) obtain for Company the right to continue use of such Deliverables as contemplated by this Agreement. Such indemnification shall not apply to such infringement to the extent it arises solely from changes made to the Deliverables by Company.

**10. Confidentiality.**

**10.1    Confidential Information.** Each party acknowledges that in the course of the performance of this Agreement, it may obtain the Confidential Information of the other party. The Receiving Party shall, at all times, both during the term of this Agreement keep in confidence and trust all of the Disclosing Party's Confidential Information received by it. The Receiving Party shall not use the Confidential Information of the Disclosing Party other than as necessary to fulfill the Receiving Party's obligations or to exercise the Receiving Party's rights under the terms of this Agreement, including but not limited to Company's rights under Section 3.1 to use, reproduce, modify and create Derivative Works of the Source Code and other Deliverables. The Receiving Party shall take reasonable steps to prevent unauthorized disclosure or use of the Disclosing Party's Confidential Information and to prevent it from falling into the public domain or into the possession of unauthorized persons, but in no event shall the Receiving Party use less care than it would in connection with its own Confidential Information of

Initials: _____ _____

PET TECHNOLOGIES, INC. D/B/A INMOTION GROUP CONFIDENTIAL

like kind. The Receiving Party shall not disclose Confidential Information of the Disclosing Party to any person or entity other than its officers, employees and consultants who need access to such Confidential Information in order to effect the intent of this Agreement and who have entered into confidentiality agreements which protect the Confidential Information of the Disclosing Party sufficient to enable the Receiving Party to comply with this Section 10.1.

10.2 **Exceptions to Confidential Information.** The obligations set forth in Section 10.1 shall not apply to the extent that Confidential Information includes information which is: (a) now or hereafter, through no unauthorized act or failure to act on the Receiving Party's part, in the public domain; (b) known to the Receiving Party without an obligation of confidentiality at the time the Receiving Party receives the same from the Disclosing Party, as evidenced by written records; (c) hereafter lawfully furnished to the Receiving Party by a third party without restriction on disclosure; (d) furnished to others by the Disclosing Party without restriction on disclosure; or (e) independently developed by the Receiving Party without use of the Disclosing Party's Confidential Information.

10.3 **Permitted Disclosures.** Nothing in this Agreement shall prevent the Receiving Party from disclosing Confidential Information (1) to any third parties retained by Company to develop Derivative Works or customized versions of the Software, provided that such developers are under obligations of confidentiality substantially similar to those set forth in this Agreement; or (2) to the extent the Receiving Party is legally compelled to do so by any court, governmental investigative or judicial agency pursuant to proceedings over which such court or agency has jurisdiction; provided, however, that prior to any such disclosure, the Receiving Party shall (i) assert the confidential nature of the Confidential Information; (ii) immediately notify the Disclosing Party in writing of the order or request to disclose; and (iii) cooperate fully with the Disclosing Party in protecting against any such disclosure and/or obtaining a protective order narrowing the scope of the compelled disclosure and protecting its confidentiality.

10.4 **Other Permitted Disclosures.** Either party may provide a copy of this Agreement to the following persons and/or entities who are under obligations of confidentiality substantially similar to those set forth in this Agreement: potential acquirers, merger partners or investors and to their employees, agents, attorneys, investment bankers, financial advisors and auditors in connection with the due diligence review of such party. Either party also may provide a copy of this Agreement to: (i) the party's accounting firm, and (ii) to the party's outside legal advisors.

11. **Limitation of Liability.**

11.1 **Waiver of Consequential Damages.** EXCEPT WITH RESPECT TO A CLAIM FOR INDEMNIFICATION MADE UNDER SECTION 9 OR A BREACH OF THE CONFIDENTIALITY OBLIGATIONS UNDER SECTION 10 (INCLUDING ANY WRONGFUL RELEASE OF DEVELOPER SOURCE CODE BY COMPANY TO THE PUBLIC), NEITHER PARTY SHALL HAVE ANY LIABILITY FOR INCIDENTAL, CONSEQUENTIAL, INDIRECT, SPECIAL OR PUNITIVE DAMAGES OR LIABILITIES OF ANY KIND OR FOR LOSS OF REVENUE, LOSS OF BUSINESS OR OTHER FINANCIAL LOSS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, EVEN IF ANY REPRESENTATIVE OF A PARTY HERETO HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

11.2 **Limitation of Liability.** EXCEPT WITH RESPECT TO A CLAIM FOR INDEMNIFICATION MADE UNDER SECTION 9 OR A BREACH OF THE CONFIDENTIALITY OBLIGATIONS UNDER SECTION 10 (INCLUDING ANY WRONGFUL RELEASE OF DEVELOPER SOURCE CODE BY COMPANY TO THE PUBLIC), IN NO EVENT SHALL EITHER PARTY'S LIABILITY UNDER THIS AGREEMENT EXCEED THE AMOUNTS PAID BY COMPANY TO DEVELOPER UNDER THIS AGREEMENT.

12. **Export Regulations.** Neither party shall export, directly or indirectly, any technical data or software acquired under this Agreement or the direct product of any such technical data or software to any country for which the United States Government or any agency thereof, at the time of export, requires an export license or other government approval, without first obtaining such license or approval. With respect to any export transactions in connection with this

Initials: _____

**PET TECHNOLOGIES, INC. D/B/A INMOTION GROUP CONFIDENTIAL**

Agreement, both parties shall cooperate in any reasonable manner to effect compliance with all applicable export regulations. Without limiting the foregoing, Developer agrees to provide all information in Developer's possession as to the classification of the Deliverables for export control purposes, as reasonably requested by Company from time to time.

**13. Term and Termination.**

**13.1  Term.** This Agreement shall commence on the Effective Date and remain in effect in perpetuity thereafter, unless terminated earlier as specified below.

**13.2  Right to Terminate for Breach.** Either party shall have the right to terminate this Agreement if the other party is in material breach of any term or condition of this Agreement and fails to remedy such breach within thirty (30) days after receipt of written notice of such breach given by the non-breaching party.

**13.3  Effect of Termination.**

13.3.1  Upon termination of this Agreement pursuant to Section 13.2 above, all of the rights and licenses granted to Company hereunder shall continue and survive, subject to Company's continued compliance with the terms and conditions of this Agreement. Without limitation, Company shall retain its licenses to the Software and other Deliverables provided hereunder.

13.3.2  If, however, Developer terminates this Agreement pursuant to Section 13.2 above due to a failure to pay a NR Fee, the rights and licenses granted to Company hereunder shall terminate three (3) months after the effective date of termination (the "Wind Down Period"). At the end of the Wind Down Period, Company shall discontinue the further use of the Software.

**13.4  Other Obligations upon Termination.** Subject to Section 13.3 above, upon the termination of the Agreement, each party, as the Receiving Party, shall, within thirty (30) days of any termination of this Agreement, return to the Disclosing Party or destroy all full or partial copies, in whatever media, of any and all Confidential Information in the Receiving Party's possession that had been furnished to the Receiving Party by the Disclosing Party pursuant to this Agreement, and, if requested, the Receiving Party shall represent in writing to the Disclosing Party within thirty (30) days after termination that all such Confidential Information has been returned to the Disclosing Party or destroyed. For the avoidance of doubt, this paragraph shall not be construed to require Company to return or destroy any Deliverables provided hereunder, unless Developer terminates this Agreement pursuant to Section 13.3.2 above, and then only after the conclusion of the Wind Down Period. Termination of this Agreement shall not relieve Company from any obligation to pay Developer for amounts owing as of the effective date of termination.

**13.5  Survival.** The parties agree that the provisions of this Agreement which by their nature or terms survive the termination of this Agreement, including, without limitation, the definitions and the following Sections, shall survive such termination: Sections 3.1, 7, 8, 9, 10, 13.3, 13.4, 13.5 and 14.

**14. Miscellaneous.** All notices and communications hereunder are required to be sent to the address or telecopier number stated above (or such other address or telecopier number as subsequently notified in writing to the other party): (i) by facsimile with confirmation of transmission, (ii) personal same or next day delivery or (iii) sent by international express courier with written verification of delivery. All notices so given shall be deemed given upon the earlier of receipt or two (2) days after dispatch. This Agreement may be amended or supplemented only by a writing that is signed by duly authorized representatives of both parties. No term or provision hereof shall be considered waived by either party, and no breach excused by either party, unless such waiver or consent is in writing signed on behalf of the party against whom the waiver is asserted. No consent by either party to, or waiver of, a breach by either party, whether express or implied, shall constitute a consent to, waiver of, or excuse of any other, different, or subsequent breach by either party If any provision of this Agreement is held invalid or unenforceable for any reason, the remainder of the provision shall be amended to achieve as closely as possible the economic effect of the original term and all other provisions shall continue in full force and effect. Any controversy or dispute arising between the parties under this agreement shall be resolved in

Initials: _[signature]_ _[signature]_

PET TECHNOLOGIES, INC. D/B/A INMOTION GROUP CONFIDENTIAL

accordance with MCL 600.5001-600.5035 by a 3-person arbitration panel. Each party shall select an arbitrator and the arbitrators chosen by the parties shall select a third arbitrator. If the parties and/or the arbitrators selected by each of them cannot agree upon the selection of a third arbitration, the third arbitrator shall be chosen by a court of competent jurisdiction. Each party shall pay for the arbitrator they select and one-half of the cost of the third arbitrator. The arbitration hearing shall be conducted in the office of the neutral arbitrator unless the parties agree otherwise. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction. This Agreement shall be deemed to have been made and entered into in Troy, Michigan. Neither party shall be liable for any failure or delay in performance under this Agreement due to fire, explosion, earthquake, storm, flood or other weather, unavailability of necessary utilities or raw materials, war, insurrection, riot, act of God or the public enemy, act of terrorism, law, act, order, proclamation, decree, regulation, ordinance, or instructions of government or other public authorities, or judgment or decree of a court of competent jurisdiction (not arising out of breach by such party of this Agreement) or any other event beyond the reasonable control of the party whose performance is to be excused. Each party may assign this Agreement to any person or entity in connection with a merger, acquisition or sale of all or substantially all of its assets to which this Agreement relates, provided the assignee agrees in writing to be bound by the terms of this Agreement. Otherwise, neither party may assign, voluntarily, by operation of law, or otherwise, this Agreement, in whole or in part, or delegate any duties under this Agreement without the other party's prior written consent, and any attempt to do so without such consent shall be void. This Agreement shall bind, and inure to the benefit of, the parties and their respective successors and permitted assigns. The parties to this Agreement are independent contractors. There is no relationship of agency, partnership, joint venture, employment, or franchise between the parties. Neither party has the authority to bind the other or to incur any obligation on its behalf. The sections on limitation of liability, warranties and disclaimer of warranties allocate the risks in the Agreement between the parties. This allocation is an essential element of the basis of the bargain between the parties. This Agreement has been negotiated by the respective parties hereto and their attorneys and the language hereof shall not be construed for or against any party. The titles and headings herein are for reference purposes only and shall not in any manner limit the construction of this Agreement, which shall be considered as a whole. This Agreement may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument. If this Agreement is executed in counterparts, no signatory hereto shall be bound until both the parties named below have duly executed or caused to be duly executed a counterpart of this Agreement. Facsimile signatures of the parties shall be binding. This Agreement is non-exclusive. Nothing in this Agreement shall be construed to preclude Company from independently developing, acquiring or marketing software that may perform the same or similar functions as those software products offered by Developer. Neither party shall, without the other party's prior written approval, make any public announcement or disclosure as to the existence or matters set forth in this Agreement that also names or describes the other party, other than to employees, officers, directors, consultants, professional advisors who have a need to know or as required by such party's disclosure obligations under the securities laws or regulations of the United States or any state thereof. This Agreement, including all Exhibits to this Agreement, constitutes the entire agreement between the parties relating to this subject matter and supersedes all prior or simultaneous understandings, representations, discussions, negotiations, and agreements, whether written or oral, relating to such subject matter.

    IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the dates set forth below, effective as of the Effective Date.

Initials

INMOTION GROUP CONFIDENTIAL

"Company"

JEMA MEDIA, LLC

By: _____

Name: _____Jeff Lord_____

Title: ____CEO____

Date: ___7/10/12___

"Developer"

Pet Technologies, Inc., d/b/a inMotion Group

By: _____

Name: ___IRVINE PASCUAL___

Title: ___VICE PRESIDENT___

Date: ___6/18/2012___

INMOTION GROUP CONFIDENTIAL

# EXHIBIT A

## Software

- inClick ad serving software, version 4.0.00X-X for Linux-based operating system

inClick Features and Functionality:

Ad Serving Features
 - DMA Region ad delivery.
 - Bid-for-Placement
 - Proxy Bidding or Fixed Bid
 - Minimum of 50 queries per second for a single node installation.
 - Load balancing capable via horizontal scaling
 - Text-based advertising system
 - Multiple creative styles
 - Ad Scheduling
 - Keyword based ad delivery
 - Channel / Zone based ad delivery
 - XML Data Feeds for total customization
 - Country based Geographic Targeting (includes GeoIP data created by MaxMind)
 - Publisher Program - Run your own Pay-per-Click Affiliate network
 - Create an "Ads by ..." Network (Affiliate or Partner Program)
 - Advertiser Reporting
 - Publisher Reporting
 - Credit Card Payment Gateway (Authorize.net or CyberSource account and Merchant account required)
 - PayPal IPN Support (PayPal Business account required)
 - 2Checkout Support
 - Detailed reporting (Some stats delayed by up to 20 minutes)
 - Multi-layered Click-Fraud protection
 - Pre-defined IAB standard layouts: Banner, Leaderboard, Tower, Rectangle, Cube
 - Easy to use web interface.
 - This product includes encryption routines through the use of a third-party PHP module, Mcrypt.

Administration Features
 - View Ads
 - Administrative Hold Accounts
 - View statistics per account or for the entire network
 - Create or Edit Zones and set Zone specific CPCs
 - Limit the number of characters per ad.
 - Earnings report

Advertiser Features
 - View, edit, create ads
 - CPC suggestion
 - Create account
 - Notification of low funds and exhausted funds
 - Reporting (Some reports delayed)

**INMOTION GROUP CONFIDENTIAL**

  - Setting of maximum daily spend per advertisement
  - Self-service system
  - Ad Scheduling. Set when ads will start and end.

Publisher Features (Running as an Ad Network - The Affiliate Program)
  - Real-Time Earnings Reports by day, month, year
  - Pre-defined IAB standard layouts: Banner, Leaderboard, Tower, Rectangle, Cube
  - XML Data Feed - Integration into existing systems.
  - JSON Data Feed - Integration into existing systems.
  - Self-service system

**INMOTION GROUP CONFIDENTIAL**

## EXHIBIT B

### NR Fees

Company agrees to pay Developer one-hundred fifteen-thousand dollars ($115,000) for the Deliverables to be provided hereunder, according to the following schedule:

a. Delivery of the Software in Source Code form and related Source Code Materials has occurred prior to execution of this Agreement following receipt one-hundred fifteen-thousand dollars ($115,000.00) of the total NR Fees, which is acknowledged as received by Developer, for the deployment ID of 3075 and 3521 known as jemamedia.com

b. Any additional instance / deployment may be added to this Agreement for $23,000.00 USD each.

## EXHIBIT C

### Delivery Schedule

Delivery completed prior to execution.

**INMOTION GROUP CONFIDENTIAL**

**EXHIBIT D**

20 Hours of training / engineering is included.

**INMOTION GROUP CONFIDENTIAL**

**EXHIBIT E**
SEE ATTACHED STATEMENT OF WORK

**INMOTION GROUP CONFIDENTIAL**

### EXHIBIT F

Technical Contacts

| | |
|---|---|
| Company Technical Contacts: | NAME:<br>EMAIL ADDRESS:<br>PHONE NUMBER: |
| Developer Technical Contacts: | Bing Pascual<br>bpascual@inmotiongroup.com<br>(248)581-8787 Ext 202<br><br>Patrick Gerzanics<br>patrickg@inmotiongroup.com<br>(248)581-8787 Ext 207 |

**Exhibit E**
**Statement of Work ("SOW")**

This SOW is part of the Source Code and Object Code License dated as of January 18, 2011 between Jema Media, LLC, an Arizona limited liability company (Company), and InMotion Group (IMG), a subsidiary of PetTechnologies, Inc., a Michigan corporation (the License). In the event of a conflict or inconsistency between the License and this SOW, the terms of the License shall govern and control.

CONFIDENTIALITY NOTICE

This document contains confidential information of InMotion Group which is provided for the sole purpose of permitting the recipient to evaluate the proposal submitted herewith.

1.  **INTRODUCTION**:
    This SOW dated January 18, 2011 effective between Jema Media,LLC, an Arizona limited liability company (Company), and InMotion Group (IMG), a subsidiary of PetTechnologies, Inc., a Michigan corporation, is a technical specification for an IMG inClick Engineering Configuration / Hardware Management engagement. It is intended to be reviewed by Company and IMG to ensure that Company's requirements have been addressed. The SOW provides a summary of the required level of effort to perform the requested work and, if contracted for, the implementation of the work proposed. The SOW will outline the technical skills IMG will provide, and the services to be performed. An authorized Company signature is required on this document to demonstrate agreement with the SOW and associated Company costs.
2.  **PROJECT PURPOSE**:
    Jema Media has contracted with IMG to provide the installation of an advanced web server monitoring system, minimum 8x5 monitoring services, operating system updates, operating system patches, and the application of any licensed inClick Ad Server product upgrades.
3.  **PROJECT SCOPE**:
    3.1. IMG will install and/or upgrade the inClick Ad Server and associated component requirements on deployment-related web servers for the single deployment and its directly related hostnames:
        3.1.1. www.jemamedia.com
        3.1.2. cdn.jemamedia.com
    3.2. IMG will install Nagios / Ganglia Monitoring
        3.2.1. Nagios Host Groups
            3.2.1.1.   Delivery Tier
            3.2.1.2.   Database Tier
            3.2.1.3.   Processing Tier
            3.2.1.4.   Services Tier
        3.2.2. Basic Checks
            3.2.2.1.   Ping
            3.2.2.2.   Free Disk Space
            3.2.2.3.   Load Average
            3.2.2.4.   Clock
            3.2.2.5.   User Login
            3.2.2.6.   Swap Usage
            3.2.2.7.   Critical OS Updates
        3.2.3. Specific Tier Checks
            3.2.3.1.   HTTP / HTTPS
            3.2.3.2.   MySQL – Master, Slave, Connections, Threads
            3.2.3.3.   Memcached
            3.2.3.4.   Proc tests
        3.2.4. Ganglia Metrics
            3.2.4.1.   Setup of statistics collector and processor

       3.2.4.2.    Setup of apache host for viewing Ganglia statistics
       3.2.4.3.    Setup of reporting by cluster tiers.
   3.2.5. Collection Data
       3.2.5.1.    Load Average
       3.2.5.2.    CPU User, System, Idle, Wait
       3.2.5.3.    Network in and out
       3.2.5.4.    Disk i/o
       3.2.5.5.    MySQL – questions, threads, slave status (seconds behind), slow queries)
       3.2.5.6.    httpd (works busy / free)
3.3. Monitoring of services.
   3.3.1. Update down services
   3.3.2. Respond to and correct related web services
   3.3.3. Respond to outage or latency reports
   3.3.4. Maintain backend data paths

4. **RESPONSIBILITIES**
   4.1. **IMG RESPONSIBILITIES**: IMG will not be held responsible or liable for network security breaches, intrusions, or damages that may occur as a result of the software configuration as specified by this SOW.
   4.2. **COMPANY RESPONSIBILITIES**:
   Company will designate a primary contact for this project. The designee is responsible for arranging IMG access to required resources including people, documentation, equipment, and facilities (if necessary). The designee is also responsible for coordinating the review of project deliverables, and for attending project status meetings.

   Availability of Company management and support personnel is critical to the success of this project. All requests will be provided with requested due dates. These dates are critical and will affect project completion if not met.

   Customer assumes all responsibility and liability for network security breaches, intrusions, or damages that may occur as a result of the network and equipment configuration as specified by this SOW.

5. **PROJECT SCHEDULE / TIMELINES**:
   A milestone chart, with estimated timeline for achieving those milestones, is shown below:

   | Milestone | Estimated Date |
   |---|---|
   | Hands-on technical support services. | Ongoing |

6. **PAYMENT ARRANGEMENT**
   Services rendered under this Statement of Work Agreement are calculated at a rate of 3% of the sum of all posted credits to advertiser accounts associated to the master deployment, 3.1 above.

   The amount due is invoiced at the beginning of each month for the previous month's activity and is due seven (7) days after the invoice date.

7. **PAYMENT METHOD**
   Invoices for this Statement of Work will be emailed and will be due within seven days of the invoice date. Payment may be made by Company Check, Wire Transfer, or other similar instrument.

8. **PROJECT CHANGES**
   Information contained in this document constitutes the project charter, other aspects of the project management plans, and, most important, the scope of work. Changes to the scope of

work for this project shall be made according to the following guidelines:

> Any additions, deletions, or modifications to the requirements included in the scope of this Statement of Work will require written request.
> After the request has been received, both Company and IMG will need to agree on the modified scope of work.
> An amendment to this SOW will be created and signed by both parties.

9. **PROJECT DELIVERABLES**:
For each incident of support, IMG will provide a report that includes the following information:

> Resolution or failure to resolve the issue and why. In the event of a failed support, a report of why the Service Request failed and possible resolutions.

## 10. STANDARD TERMS

A. <u>Payment of Services</u>. Company will pay IMG for services under this SOW as stated in the SOW. IMG will submit an invoice for payment to Company. If Company fails to pay for charges under this SOW within 30 days of the invoice date, IMG may charge Company interest on those charges equal to the lesser of 1 ½% per month or the maximum allowed by law.

B. <u>Term</u>. Company agrees to a quarterly contract term for services defined herein. The quarterly contract for services is automatically renewed each quarter in perpetuity subject to written cancellation by (a) Company in accordance with this Statement of Work at least ten (10) days prior to the expiration of any renewal term or (b) IMG upon providing Customer with notice of non-renewal at least ten (10) days prior to the expiration of any renewal term. The SOW term is effective on the above date.

C. <u>Non-Solicitation</u>. During the SOW's term and for one year following its termination, each party agrees that it will not hire the other party's employees, or subcontractors, who were involved in any way with the performance of this SOW without the other party's written permission. If one party, or its affiliates, extends an employment offer to such of the other party's employee's, or subcontractors, the hiring party will pay the other party, as liquidated damages, an amount equal to 50% of the accepting employee's, or subcontractors, new annual salary. The non-hiring party will also be entitled to any other remedies at law or in equity, to obtain injunctive relief.

D. <u>Indemnification</u>. Each party will indemnify the other party, its directors, employees, agents and their successors against all claims, damages or liabilities, including costs and reasonable attorneys' fees, only for claims made for personal injury, death, or damage to personal property resulting from the negligent or willful misconduct of the indemnifying party or its subcontractors, directors, employees or agents that arise directly from the performance of this SOW.

E. <u>Use of Name, Service Marks, Trademarks or Trade Secrets</u>. Neither party will use the name, service marks, trademarks, or trade secrets of the other party or any of its affiliates for any purpose without the other party's consent.

F. <u>Compliance</u>. Each party and their employees will comply with applicable laws and regulations of government authorities.

G. <u>Notices</u>. Any notice required under this SOW or related to a dispute must be submitted in writing to the appropriate party's address shown below.

H. <u>Reliance</u>. In accepting this SOW, Company is not relying on any representations or promises not in this SOW. When signed by the parties this SOW and the License will constitute the parties' entire understanding regarding services and supersede all other agreements or discussions, oral or written, regarding services.

PREPARED BY: Irvine Pascual, Vice President
APPROVED BY: Cheryl Bauman, President

Jema Media

By: _____
Authorized Signature

Date: 7/6/12

Jeff Lert CEO
Name and Title (Please Print)

Address for Notice:
15230 N 7th Street
#2080
Scottsdale AZ, 85260

INMOTION GROUP

By: _____ VP
Authorized Signature

Date: 6/18/2012

IRVING PASCUAL   VICE PRESIDENT
Name and Title (Please Print)

Address for Notice:
INMOTION GROUP
116 KENYON
TROY MI  48083
Voice 248-616-1943  Fax 248-589-0052